891 So.2d 455 (2004)
Kenneth Louis DESSAURE, Appellant,
v.
STATE of Florida. Appellee.
No. SC02-286.
Supreme Court of Florida.
December 2, 2004.
*456 James Marion Moorman, Public Defender and Paul C. Helm, Assistant Public *457 Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Stephen D. Ake, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
Kenneth Louis Dessaure appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND
Dessaure was charged by indictment with the February 9, 1999, first-degree murder of Cindy Riedweg. Dessaure's trial began in the Circuit Court in and for Pinellas County on August 28, 2001. On September 5, 2001, the jury found Dessaure guilty of first-degree murder.[1] Dessaure waived his right to a penalty phase jury. On October 26, 2001, the court sentenced Dessaure to death. The evidence presented at trial established the following:

Guilt Phase
Dessaure lived with Amy Cockrell and Tim Connole in apartment 1307 of the Villas at Countryside in Oldsmar, Florida. Riedweg moved into apartment 1308 next door to them a couple of weeks before the murder. Dessaure did not have a social relationship with Riedweg and had not been inside her apartment prior to the day of the murder.
On February 9, 1999, Cockrell left her apartment at 8 a.m. Dessaure, Connole, and Connole's friend, Ivan Hup, were there when she left. Connole and Hup went out for lunch around noon, leaving Dessaure alone in the apartment.
One of Riedweg's neighbors, John Hayes, left his apartment to go to work around 3:30 p.m. and encountered Dessaure in the parking lot. Dessaure told him that he thought there was someone dead or dying in Riedweg's apartment. When Hayes asked him how he knew that, Dessaure said he had gone to Riedweg's apartment for ice and looked in. Hayes testified that Dessaure seemed nervous and his left hand was balled up. Hayes did not want to become involved and told Dessaure to call 911.
Dessaure called 911 at 3:35 p.m and spoke to Donna Biem, a 911 supervisor. Biem transferred the call to Antoinette Maglione, a 911 operator for the sheriff's office, at 3:37 p.m. A tape recording of Dessaure's conversations with Biem and Maglione was played for the jury. Dessaure told Biem that his next-door neighbor was dead and said, "I walked over to see if Cindy had some ice and she was sun bathing and her phone and everything was outside so I opened up the door and she's laying in the middle of her f_____ hallway naked." Dessaure also said he asked a "home boy" to help, but he would not come over. After his call was transferred to Maglione, the following exchange occurred:
COMMUNICATIONS CENTER: Okay. Sheriff's Office. What's your emergency?
KENNETH DESSAURE: Yes, um, my next door neighbor's dead.

*458 COMMUNICATIONS CENTER: Is what?
KENNETH DESSAURE: Dead. I think she's dead.
COMMUNICATIONS CENTER: Okay. And what's her address?
KENNETH DESSAURE: 1308 Amanda Lane. F____.
COMMUNICATIONS CENTER: Any idea how?
KENNETH DESSAURE: Um, I do not know.
COMMUNICATIONS CENTER: Okay.
KENNETH DESSAURE: Ow. F____.
COMMUNICATIONS CENTER: Excuse me?
KENNETH DESSAURE: Huh?
COMMUNICATIONS CENTER: What's going on?
KENNETH DESSAURE: I just cut my finger. I'm washing my dishes. I just came in to finish washing my damn dishes.
COMMUNICATIONS CENTER: And, um, or are  have you seen her or been in there and touched her or anything?
KENNETH DESSAURE: I haven't touched her at all.
COMMUNICATIONS CENTER: Okay. So what's your name?
KENNETH DESSAURE: My name is Kenny.
COMMUNICATIONS CENTER: Kenny?
KENNETH DESSAURE: Yeah. I live next door.
COMMUNICATIONS CENTER: Tell me what happened.
KENNETH DESSAURE: Um, I was cleaning my house and f______ I seen her outside sunbathing and I went next door to see if she had some f______ ice and all her stuff was sitting outside, so I figured that she was in the bathroom or something. And then I go knock on the door and I didn't get no answer so I'm waiting for a response and the door was unlocked so I went in and she's laying in the middle of the f______ hallway.
COMMUNICATIONS CENTER: Okay. All right. Then she was not breathing?
KENNETH DESSAURE: Huh?
COMMUNICATIONS CENTER: She was not breathing?
KENNETH DESSAURE: I don't know. I didn't walk up to her. I just walked out of the house.
COMMUNICATIONS CENTER: Okay.
KENNETH DESSAURE: And I went to the boy that's standing outside and I just cut my f_____ finger.
COMMUNICATIONS CENTER: Okay. All right, Kenny, we'll get somebody out there. You haven't seen anybody unusual or anything around?
Paramedic Greg Newland, Captain Robert Carman, and EMT Jill Manines arrived at the scene at 3:39 p.m. Dessaure met them and led them to Riedweg's apartment. Newland testified that the back of Dessaure's shirt appeared to be wet. Dessaure told them that he went to Riedweg's apartment to borrow some ice and found her on the floor. Newland entered the living room of the apartment and found Riedweg lying on the floor in a pool of blood. Riedweg was lying face down with her arms tucked under her body. There were stab wounds to her upper back and shoulders. Riedweg had no pulse and was not breathing, but her body was still warm. Newland rolled Riedweg over and discovered that her throat had been slashed. He pronounced her dead at 3:41 p.m.
*459 Newland and Manines remained at the front door of the apartment to prevent anyone from entering. Carman cordoned off the area with fire scene tape. Dessaure approached them several times, asking them if Riedweg was alright and what was wrong with her. He seemed anxious. Newland saw Dessaure walk up to several apartments and talk to other people from the complex who gathered at the scene.
Tim Connole returned to his apartment between 4 and 4:30 p.m. He testified that fire trucks and paramedics were there, but his apartment had not been sealed off. Dessaure was acting nervous and told Connole that he went to Riedweg's to get some ice and discovered the body. Two or three hours after he got there, Connole noticed blood on Dessaure's shirt and asked him about it. Dessaure said he cut his hand doing the dishes and showed Connole the cut.
Amy Cockrell returned to her apartment between 4:30 and 4:45 p.m. Connole and Hup were already there. Hup told her that Dessaure went to Riedweg's apartment for ice. Cockrell testified at trial that the next day she looked in her freezer and found a cup of ice but no ice cube tray. However, Cockrell admitted on cross-examination that in a May 14, 1999, statement to the prosecutor, she stated that after Hup said Dessaure went to Riedweg's to get ice she got suspicious, walked into her apartment, and discovered a full ice cube tray in the freezer. In her prior statement she said, "I found a tray of ice" and further stated that the ice in the tray was "hard and frozen." She testified at trial that when she gave her original statement she meant "cup" when she said "tray." On the night of the murder, police technicians seized items from Dessaure's apartment, including an ice cube tray which was full of frozen ice.
In March, the lease ran out on Cockrell and Connole's apartment and they moved. They packed a knife set and later noticed that one of the knives from the set was missing. They had bought the knife set prior to February 9, 1999, and it was in their apartment on the day of the murder.
Detective Thomas Klein and his partner, Detective Tim Pupke, arrived at Riedweg's apartment at 5:14 p.m. They expanded the crime scene to include Dessaure's apartment. Klein entered Riedweg's apartment and saw blood stains on the carpet in the living room. Once he reached the living room chair, he could see Riedweg's body lying in the hallway. Klein found a scuff mark on the kitchen floor and a pool of water near the refrigerator and sink.
Dessaure took Klein and Craig Giovo of the Pinellas County Sheriff's Office Forensic Science Unit into his apartment to show them the knife with which he said he cut his hand while he was washing dishes. Giovo saw blood stains on the threshold and at the bottom of the door of Dessaure's apartment and later took samples. Dessaure showed them a knife lying on a dry sponge next to the kitchen sink. The knife had blood smeared on it. They opened the freezer door at 7:15 p.m. and saw blood stains on the bottom of the freezer and on the ice tray. There was frost on the ice tray, and the ice cubes were frozen solid. Giovo collected the ice tray and dumped the ice cubes in the sink. Dessaure told the detectives that the ice cubes were not quite frozen earlier in the afternoon when he wanted ice, and that was the reason he went to Riedweg's apartment. Klein asked Dessaure to accompany him to the Sheriff's Office to make a statement. Dessaure's taped statement was played for the jury.
In his statement to police, Dessaure said that after his roommates left, he turned on the radio and started to clean at around 2 *460 or 2:30 p.m. He took the garbage out to the dumpster at around 2:45 p.m. and saw Riedweg sunbathing in a bikini with her eyes closed. When he returned from the dumpster, he did not notice whether Riedweg was still outside because he looked down while he walked. Dessaure put detergent and bleach in water in the sink and began washing a knife. The knife slipped and cut the palm of his hand. He put the knife down and ran water on the cut.
He finished drinking a cup of water and wanted another cup of cold water. The ice cube tray was empty, so he filled it and put it and a cup in the freezer. He went to Nathan Philips' apartment to get some ice, but Philips was not at home. Dessaure went back into his apartment to get his cup; then, he went next door to Riedweg's apartment. He knocked on the door and yelled for "Cindy." He noticed that her stuff was still outside. Her door was unlocked, so he opened it, called for her, and after receiving no answer entered the apartment. He did not see anyone, so he walked to the edge of the kitchen. He saw Riedweg lying on the floor with blood on her and left the apartment without touching anything. Dessaure saw Hayes in the parking lot, told him he thought a lady was dead, and asked him for help. Hayes told him to call the police and walked away.
Dessaure picked up Riedweg's phone, which was outside by her lawn chair, and called 911. While he was on the phone with the sheriff's department operator, he went back inside his apartment to look for a cigarette but could not find one, so he picked up the knife he had cut himself with earlier and began to clean it again. While still on the phone with the sheriff's department, he cut himself again in the same exact spot that he cut himself earlier. Dessaure said that every time he cuts himself it is always in that same spot.
Detective Pupke asked Dessaure about his earlier statement that he was using bleach to wash the dishes. Dessaure corrected himself and said it was not bleach; it was dish detergent. He admitted there was bleach in the house, but he thought it was kept in the bathroom. The only time he used it was to clean an old refrigerator.
There was a lengthy discussion between the detectives and Dessaure concerning an argument that he had with his fiancee, Mary Parent. Parent called Dessaure sometime between noon and 2:30 p.m., and they began to argue. Dessaure accused Parent of cheating on him, and Parent accused Dessaure of cheating on her.
Detective Pupke asked if Riedweg was a good-looking woman. Dessaure answered, "yeah." He said he had never gone to her apartment to ask her for anything other than ice on the day of the murder. She had never invited him into her apartment. He said he opened her door and entered her apartment because he was worried about her. Dessaure said that if he knows his friends are home, he knocks on their door and opens it. He specifically stated that he does it at Nathan Philips' house.
The detectives accused Dessaure of wanting sex from Riedweg and fighting with her when she resisted. He denied these allegations and denied killing Riedweg.
After the interview, Klein arrested Dessaure on an unrelated matter.[2] When Klein told Dessaure he was under arrest, Dessaure said he was leaving and started fighting with the detectives, causing his hand to bleed. Dessaure was not arrested for the murder until August 26, 1999, after he was indicted.
*461 Klein interviewed and obtained a blood sample and prints from Stuart Cole, Riedweg's married boyfriend, and confirmed Cole's whereabouts for the hours of 1:50 p.m. to 6 p.m. He determined that Cole had been at Riedweg's apartment earlier in the day. Cole made a cell phone call in front of her apartment at 11:20 a.m. and left the apartment around 1 p.m. Cole died in a traffic accident a few months after Riedweg's murder and did not testify at Dessaure's trial.
Brandy Adams and Nathan Phillips lived near Riedweg in an apartment at the Villas of Countryside. Adams was home all day on February 9, 1999, with her windows and door open. She said that Dessaure did not come to her apartment that day. When asked about Dessaure's statement that he would knock on their door, open it, and walk in without them answering the door, both Adams and Philips said that he was not authorized to do so.
Dr. Laura Hair, an assistant medical examiner, performed an autopsy on Riedweg's body on February 10, 1999. Hair found that Riedweg had suffered a total of fifty-three wounds, including three bruises, fifteen scrapes and pick marks, sixteen superficial cuts, fifteen deeper cuts, and four stab wounds. There were five defensive wounds to the hands, three wounds that penetrated the trachea, three that damaged and collapsed the lungs, two that cut the exterior jugular vein, one that cut the liver, one that struck a vertebra, and one that cut a spinal nerve. Hair testified that Riedweg could have remained conscious for four to six minutes after her lungs collapsed, and she could have survived from four to ten minutes. Electrical activity could have continued for a few minutes more, perhaps ten to fifteen minutes. Multiple stab wounds of the torso and neck were the cause of death. Riedweg had not started her menstrual cycle and the rape kit came back negative.
Michelle Sherwood, a latent print examiner for the Pinellas County Sheriff's Office, identified a latent footprint found on Riedweg's kitchen floor as matching Dessaure's right foot.
John Wierzbowski, a former Florida Department of Law Enforcement (FDLE) crime lab analyst, examined Dessaure's silver-gray T-shirt, a pair of black denim shorts, and a pair of flip-flop sandals to conduct a blood stain pattern analysis. He found a transferred blood stain inside the right front pocket of the shorts, but he could not determine what object made the stain; it could have been any object covered with blood. There were no stains of value for analysis on the sandals or shirt.
Tina Delaroche, an FDLE forensic serologist, examined Dessaure's black shorts and found six blood stains for analysis. Several of the stains matched Riedweg's DNA profile. Other stains may have come from Riedweg, but testing was not conclusive. She examined Dessaure's shirt and found a faint blood stain on the front and a stronger blood stain on the back. Her tests showed that the DNA profile from the stronger stain was consistent with Dessaure. Blood stains on the knife from Dessaure's kitchen were also consistent with Dessaure. She also examined a towel found in Riedweg's bathroom and a piece of fabric from Riedweg's bedroom comforter. White stains on the towel and comforter tested positive for semen. The DNA profile of the semen was consistent with Dessaure. Swabs from Dessaure's apartment tested positive for blood, but none of them were consistent with Riedweg. None of the tested blood samples from Riedweg's apartment were consistent with Dessaure.
Valdez Hardy, a former prison inmate who was in the same cell pod in the Pinellas *462 County Jail as Dessaure, gave a sworn statement on November 4, 1999. Hardy testified that Dessaure told him he was concerned about a washrag that might have his semen on it. Dessaure said he came home one morning and saw Riedweg sunbathing in a lawn chair. He went upstairs, then came back down to take out the trash. He winked at her when he walked by and went back upstairs. When he came back down, she was gone. She had left her phone and a cup by her chair. He went to her door, found that it was open, and went inside. She saw him and "started tripping." Hardy thought that meant that she was screaming or getting nervous. Dessaure said the washrag was "the only thing that can really prove that." They already knew he was there because he called 911 and when he was leaving the apartment a guy saw him. He told the man that a girl was in there dead. The man told him to call the police. Dessaure said he went outside, picked up her phone, and called 911. Hardy asked if there was a lot of blood, and Dessaure answered, "yeah." A few days later he said that Riedweg was naked on the floor. Hardy said Dessaure told him the paramedics came first. He was outside smoking a cigarette, and he was nervous. The detectives questioned him and asked how he got the cut on his arm. He said he cut himself on a knife. They took him to his house, and he showed them the knife. Dessaure said that when he went to the police station, he asked the police why he would have called 911 if he had killed her. They told him he was facing the death penalty. When he got up to leave, one of the detectives grabbed him, slammed him against the wall, and arrested him. Dessaure said they took his roommate's shoes because he had changed shoes. He had been wearing flip-flops. He said something about a foot or a scuff mark in the kitchen. According to Hardy, Dessaure said that "can't nobody say he killed her. Don't nobody know what happened but him and her."
On cross-examination, Hardy denied that his conversation with Dessaure occurred on October 1, 1999, after a corrections officer left a newspaper with an article about Dessaure's case in the cell pod. He denied that he read the article, which stated that semen matching Dessaure's DNA profile was found on a towel in Riedweg's bathroom. The State had Hardy read the article in court and pointed out that there was nothing in it about Dessaure taking out the trash, scuff marks on the kitchen floor, leaving Riedweg naked on the floor, her having an immaculate house, a phone by her lawn chair, his roommate's shoes, paramedics arriving first, flip-flops, the detectives slamming him to the floor, seeing a guy as he was leaving, telling the guy she was dead, the guy telling him to call the police, and that he cut himself. Hardy also denied seeing or reading any police reports or depositions in Dessaure's case.
Shavar Sampson, another fellow inmate of Dessaure's, also testified that Dessaure told him about his case. According to Sampson, Dessaure saw Riedweg outside sunbathing. He wanted to talk to her, but she did not want to have a conversation with him. The next day Dessaure went inside her apartment while she was outside sunbathing because he wanted to surprise her. When she came inside, he tried to talk to her, but she did not want to talk. She punched him. He punched her back and knocked her unconscious. He took off her two-piece bathing suit and began to have sex with her. She regained consciousness and began fighting to get him off her. Dessaure had a knife and stabbed her many times. He removed his clothing and put on something he brought from home. He called 911 to summon an ambulance. Dessaure said his sperm went inside *463 her while they were having sex. Her period started, blood got on his underwear, and he had to change underwear.
The defense presented the testimony of Susan Pullar, a forensic scientist who examined photos and a video of the crime scene and police reports. She testified that she would expect the assailant in this case to have impact blood spatter on his body, or at least his arms, because of the force used in inflicting the stab wounds. Some of the blood on Riedweg's body was not coming directly from a wound and could have come from the assailant, someone else bleeding, or from the knife. She said that this blood should have been collected and analyzed to determine whose blood it was. If the assailant was bleeding from a hand wound, you could find blood in the crime scene other than on the body. She did not see aspirated blood mixed with air on the body, but there was some splatter less than a millimeter wide that might be aspirated. There was no clear pattern to the contact blood stain in Dessaure's shorts pocket to show what the source of the blood was.
Dr. Edward Willey, a forensic pathologist and former medical examiner, examined a photo of the cut on Dessaure's hand and examined police reports and concluded that the cut would have bled. Opening and closing the hand would disrupt the cut and cause additional bleeding. There may have been two cuts to the hand, but he was not certain. There was no evidence of scar tissue from prior cuts.
Amy Cockrell testified that when she returned home on February 9, Connole and Dessaure were confined in a small area. She testified that she did not go into her apartment that evening because it was blocked off with crime scene tape. She went to the apartment of Nate Philips and Brandy Adams. When she finally entered her apartment on February 10, she noticed that "the dishes were in the process of being done." She said that Dessaure did most of the cleaning, including the dishes. Cockrell did not recall her prior statement on May 14, 1999, that she found an ice tray in the freezer. Instead, she said she saw a purple cup in the freezer.
William Birchard and Rodney Stafford, inmates who were housed with Dessaure and Valdez Hardy, testified that Hardy was a snitch and was trying to get information from Dessaure so he could cut a deal with prosecutors. They said the only information Hardy had was what he learned from newspapers.
Dessaure's fiancee, Mary Parent, admitted that she had an argument with Dessaure on February 9, 1999, but stated that the argument ended cordially. She also stated that Dessaure liked to fill up his cup with ice when he drank water, juice, or soda.
On rebuttal, the State presented testimony from Shavar Sampson, who was returned to the Pinellas County Jail from prison within two weeks prior to his appearance at trial. He said that while he was talking to his father on the telephone, Stafford was standing next to him talking on another phone. Stafford said he was there to testify for his home boy who killed a white girl.

Penalty Phase
Against the advice of his attorneys, Dessaure waived his right to a penalty phase jury. The court questioned Dessaure to determine whether he understood that he had the right to have defense counsel present mitigating circumstances to the jury and to have the jury make a recommendation to the court. Dessaure did not want defense counsel to present mitigating evidence to a jury. He testified that he was acting against his attorneys' *464 advice and that no one forced or advised him to make this choice. He understood that his decision could not be revoked.
The State presented victim impact testimony by Rebecca Pierce, Riedweg's supervisor, and Doreen Cosenzino, Riedweg's friend, and statements from Riedweg's sister and Riedweg's mother were read.
Defense counsel proffered, by oral summary, the mitigating evidence he would have presented if Dessaure had not waived it, including the testimony of Dessaure's delinquency case manager and counselor, his mother, half-brother, older brother, half-sister, "surrogate mother," grandmother, Mary Parent, Amy Cockrell, and Dr. Maher, a psychiatrist. Dessaure waived the testimony of each proposed witness. Dessaure also waived the presentation of any legal argument by his counsel against the aggravating circumstances. Defense counsel asserted that Dr. Maher found Dessaure competent to decide to waive mitigation and asked the court to consider Dessaure's demeanor throughout the proceedings as a mitigating circumstance. The prosecutor proffered rebuttal evidence concerning the mitigating circumstances.
The court granted the prosecutor's request to order a presentence investigation. At the Spencer[3] hearing, the defense presented testimony from Dessaure's fiancee, Mary Parent, and Louise Randall, Dessaure's grandmother.
The trial court found four aggravators: (1) crime committed while previously convicted of a felony (conspiracy to commit armed robbery) and under sentence of imprisonment (community control); (2) prior conviction of a felony involving the use or threat of violence (resisting arrest with violence); (3) heinous, atrocious, and cruel (HAC); and (4) crime committed during the course of a burglary. The court found no statutory mitigating circumstances and five nonstatutory mitigating circumstances.[4]

I. THE OPENING STATEMENT
Dessaure argues that the court abused its discretion when it denied his motion for mistrial based on the prosecutor's opening statement. During her opening statement, the prosecutor remarked that Dessaure said only two people knew what happened in Riedweg's apartment, so she had to reconstruct what happened with scientific and other evidence. Dessaure argues that these remarks were fairly susceptible of being interpreted by the jury as a comment on Dessaure's failure to testify. Therefore, he asserts that his constitutional right to remain silent was violated. The State argues that the statement was an accurate and permissible comment on State witness Valdez Hardy's anticipated testimony.

A. APPLICABLE LAW

1. Standard of Review
This Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard. Cole v. State, 701 So.2d 845, 853 (Fla.1997). An order granting mistrial is required only when the error upon which it rests is so *465 prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial. Id. (citing Overton v. State, 801 So.2d 877, 898 (Fla.2001)).[5]

2. Merits
A defendant has the constitutional right to decline to testify against himself in a criminal proceeding. See U.S. Const. amend. V; art. I, § 9, Fla. Const. Therefore, "[a]ny comment on, or which is fairly susceptible of being interpreted as referring to, a defendant's failure to testify is error and is strongly discouraged." State v. Marshall, 476 So.2d 150, 153 (Fla.1985); see also Fla. R.Crim. P. 3.250 (prosecuting attorney prohibited from commenting on the defendant's failure to testify on his or her behalf). The "fairly susceptible" test is a "very liberal rule." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
In Heath v. State, 648 So.2d 660, 663 (Fla.1994), the Court considered whether prosecutorial comments were "fairly susceptible" of being interpreted by the jury as a comment on the defendant's failure to testify. The prosecutor stated during opening statements:
You're going to hear testimony, ladies and gentlemen, from the only person who can tell you about what Kenny and Ronnie [Heath] did. Michael Sheridan's dead; he can't tell you what happened. Kenny Heath is going to come before you and tell you how Michael Sheridan died.
Id. The Court held that the prosecutor's statements constituted an impermissible comment on Ronnie Heath's right not to testify. Id. The Court then held that the comment was harmless beyond a reasonable doubt. Id.

B. APPLICATION OF LAW
During the State's opening argument, the prosecutor said:
In this particular case, as Kenneth Dessaure said himself, there [are] only two people that know exactly what occurred in that apartment. So, therefore, it is my job to take the physical evidence, the scientific evidence, the photographs, the witnesses' statements, experts, scientists, forensic technicians, and reconstruct what occurred for you.
Defense counsel objected and moved for a mistrial, arguing that the State had commented on Dessaure's right to remain silent. The State argued that evidence would show that Dessaure said, "There [are] only two people that know, her and me." Indeed, evidence to that effect was presented by Valdez Hardy, a former prison inmate who had been in the same cell pod with Dessaure in the Pinellas County Jail. Hardy testified at trial that Dessaure said, "Can't nobody say he killed her. Don't nobody know what happened but him and her." The court found that the statements were not a comment on Dessaure's right to remain silent and denied the motion for mistrial.
This Court stated in DiGuilio that the "fairly susceptible" test is a very liberal *466 rule. 491 So.2d at 1135. Indeed, the test has been interpreted very liberally. Similar comments to those made in this case were held to be error in Heath. However, this case is distinguishable from Heath. First, testimony was presented that Dessaure himself said that only he and Riedweg knew what happened. Thus, the prosecutor's statement was a fair characterization of the evidence that was presented at trial. Second, we note that the jury was instructed numerous times during voir dire and the trial that the burden of proof rested solely on the State. The defense specifically stated during voir dire that Dessaure had an absolute right to remain silent, and the court issued the following instruction before opening statements:
In every criminal proceeding, a Defendant has an absolute right to remain silent. At no time is it the duty of the Defendant to prove that he is innocent. From the exercise of the Defendant's right, you are not permitted to draw any inference of guilt and the fact that the Defendant did not take the stand to testify must not influence your decision in any way.
Additionally, we note that the comments were made during opening statements and not closing argument; they were not repeated in closing argument; and the statement was made in passing. In light of these facts, we hold that the court did not abuse its discretion when it denied the motion for mistrial.

II. ASHES AS EVIDENCE OF IDENTITY
Dessaure argues that the trial court erred (1) by refusing to allow evidence that two marijuana cigarettes were found in Riedweg's apartment; (2) by refusing to allow the defense to present evidence that Riedweg's boyfriend, Stuart Cole, smoked marijuana; and (3) by allowing the State to argue during closing arguments that Dessaure was the source of the cigarette ash found in Riedweg's sink.

A. APPLICABLE LAW

1. Standard of Review
A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. Blanco v. State, 452 So.2d 520 (Fla.1984); see also State v. Polak, 598 So.2d 150 (Fla. 1st DCA 1992) (standard of review of a lower tribunal's ruling on a motion in limine is abuse of discretion); Swanson v. State, 823 So.2d 281 (Fla. 5th DCA 2002).

2. Merits
"Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2001). "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2001). "Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat. (2001).

B. APPLICATION OF LAW
As previously stated, Dessaure argues that the trial court erred (1) by refusing to allow evidence that two marijuana cigarettes were found in Riedweg's apartment; (2) by refusing to allow the defense to present evidence that Riedweg's boyfriend, Stuart Cole, smoked marijuana; and (3) by allowing the State to argue during closing arguments that Dessaure was the source *467 of the cigarette ash found in Riedweg's sink.

1. Evidence of marijuana in Riedweg's apartment and Cole's marijuana use.
Prior to trial, the State filed a motion in limine to prevent evidence of the marijuana cigarettes found in Riedweg's apartment from being introduced. The defense voiced no objection, and the trial court granted the motion. After the State introduced evidence at trial suggesting that Dessaure was the source of the cigarette ash found in Riedweg's kitchen sink, the defense moved the court to reconsider its ruling on the motion in limine, arguing that the ash may have come from the marijuana cigarettes. The court affirmed its previous ruling and stated:
I'm not going to allow it to come in. It would appear, due to the absence of any trace of cannabis in the deceased's body after her death, there not being any showing that they were smoked in the house other than the ashes that were seen in the sink, the picture of the marijuana cigarette appears that just the very end of it was lit and it does not appear that what is in the sink in any way can be tied to the small amount of marijuana that appears to have been burned off the cigarette.
During the defense's case-in-chief, the defense proffered the testimony of Daniel Copeland. Copeland was a business partner and friend of Stuart Cole's. Copeland testified during the proffer that Cole frequently used marijuana when they went golfing, and he further testified that Cole went golfing on the day of the murder. The defense attempted to introduce the evidence of Cole's marijuana use as relevant to explain the ashes found in Riedweg's sink. The court held that the evidence was inadmissible, stating:
I believe there is insufficient evidence from this witness or anybody else we have heard thus far to tie Mr. Cole to the marijuana cigarettes in the apartment. The mere fact that this witness has personal knowledge that he did, in fact, smoke some dope and routinely did so while they were playing golf, in my mind, no way ties him to what was found in the apartment. Therefore, it's, in my mind, is a violation of some type of character flaw for Mr. Cole. I don't think it's allowed under the Evidence Code. I don't think it's been sufficient to tie it in without doing a lot of assuming and I'm not going to allow it. It's in the record for somebody to look at it if they feel I made a mistake. I think, too, we have got a problem with regard to the ashes in the sink and I think the State needs to look long and hard to see how they need to use that as to, you know, how to, you know, what to say that might mean. But at this point, you know, I'm not going to comment on that.
The trial court did not abuse its discretion when it barred evidence concerning the marijuana cigarettes in Riedweg's apartment and Cole's marijuana use. The defendant failed to adequately connect either piece of evidence to a material fact in issue. There was no evidence presented that the ashes in the sink had come from the marijuana cigarettes, that the cigarettes belonged to Cole, or that Cole had smoked marijuana in Riedweg's apartment on the day of the murder. No marijuana was found in Riedweg's system at the time of the autopsy. Additionally, the proffered testimony of Daniel Copeland concerning his general knowledge of Cole's marijuana use was never sufficiently connected to the crime itself.

2. State's closing arguments regarding cigarette ash as evidence of identity.
Prior to closing arguments, defense counsel moved in limine to preclude the *468 State from arguing that the ashes found in Riedweg's sink were attributable to Dessaure. The defense argued that there was no direct evidence linking Dessaure to the ashes. The State responded that Dessaure's footprint was found near the sink; Riedweg's apartment was normally immaculate and she would have washed away the ashes; and Dessaure had been seen smoking a cigarette later that day. The court allowed the State's argument. During closing argument the State argued:
He left his ashes behind. You saw the pictures of her apartment. Her apartment was absolutely immaculate. She had only been there 10 days. There was not a book out of place. Everything had its place. Everything had its order. There were only four things out of place in her apartment, four things that the killer left behind, four things that belonged to Kenneth Dessaure. No. 1, the footprint, that's out of place in her apartment. His footprint in her apartment, she had been there 10 days, never been in there before, that's out of place. No. 2, these ashes. Remember the water jug sitting on her counter? I think we have a picture of it. If not, you will have it in the room back there. The water jug on her counter, she had filled her cup up with water some time that day while laying out. She was a neat freak. If those ashes were there before she was murdered or before he entered the apartment, they would have been washed down that sink. She filled up her water cup and those ashes would have gone down the sink and they are not. They are right there. And we all know who was smoking that day. Who told the cops around noon, one o'clock, he had a cigarette, who was seen smoking by John Hayes, who the paramedics had seen smoking, who the detectives had seen smoking, Kenneth Dessaure. Footprint out of place, ashes out of place, that towel with semen in it out of place. If he had been in that apartment sometime prior for consensual random sex with her, you, for a second, believe she would have left that towel there? She would have thrown it in the washing machine or in the laundry basket. Cindy Riedweg would not have left that towel there and she certainly wouldn't have left a stain on her bedspread. That was not her style. That's not the way she did things. Her apartment was immaculate.
Closing argument presents an opportunity for both the State and the defendant to argue all reasonable inferences that might be drawn from the evidence. Indeed, "[t]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985). This is exactly what the State did in this case. The evidence at trial showed that Dessaure's footprint was found by the kitchen sink, near a puddle of water and a scuff mark on the floor, and there was evidence that Dessaure was smoking cigarettes around the time of the murder. The State's argument simply explicated reasonable inferences that could be drawn from this evidence. Therefore, the argument was proper.

III. MOTION FOR MISTRIAL BASED ON IMPROPER IMPEACHMENT
Dessaure argues that the trial court abused its discretion by allowing the State to impeach William Birchard and Rodney Stafford, two defense witnesses, by cross-examining them about their mandatory life sentences for unrelated crimes and by denying Dessaure's motion for mistrial. Dessaure asserts that information about Birchard and Stafford's sentences *469 was improper impeachment not relevant to their bias or credibility. The State responds that the questions were proper because the same State Attorney's office had prosecuted them and was responsible for their sentences, and the State had no recourse against the witnesses if they committed perjury.

A. APPLICABLE LAW
Section 90.608(2), Florida Statutes (2001), states that a party may attack the credibility of a witness by showing that the witness is biased. Additionally, section 90.610(1), Florida Statutes (2001), provides that "[a] party may attack the credibility of any witness, including an accused, by evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted...." Importantly, section 90.610(3) explicitly provides that the admissibility of evidence under section 90.608 is not affected by the limitations contained in section 90.610(1).
In Fulton v. State, 335 So.2d 280, 284 (Fla.1976), a case concerning section 90.610(1), the Court stated:
When there has been a prior conviction, only the fact of the conviction can be brought out, unless the witness denies the conviction. If the witness denies ever having been convicted, or misstates the number of previous convictions, counsel may impeach the witness by producing a record of past convictions. Even if a witness denies a prior conviction, the specific offense is identified only incidentally when the record of the conviction is entered into evidence. If the witness admits the conviction, "the inquiry by his adversary may not be pursued to the point of naming the crime for which he was convicted."
Fulton, 335 So.2d at 284 (citations and footnote omitted).
In Howard v. State, 397 So.2d 997 (Fla. 4th DCA 1981), a case concerning section 90.608(2), the Fourth District Court of Appeal allowed the State to introduce evidence of a defense witness's prior conviction of obstructing justice. The court stated:
To show bias it is obviously necessary to show the nature of acts by the witness which evidence such bias. To do this it is necessary to show and explain the nature of the crime of which the witness was convicted. Thus we agree with the trial court's conclusion that conviction of a specified crime may be introduced to show bias of a witness.
Howard, 397 So.2d at 998.
The Fourth District considered a similar scenario in Roper v. State, 763 So.2d 487 (Fla. 4th DCA 2000). The State introduced evidence that a defense witness resided in a jail and argued that "[m]aybe he has a bias against the state or officers." Id. at 489. The court differentiated Howard and held that in Roper"there was no attempt by the state to show that being incarcerated resulted in any bias against law enforcement as the conviction for obstructing justice tended to show bias in Howard." Roper, 763 So.2d at 490.
In Reeves v. State, 711 So.2d 561 (Fla. 2d DCA 1997), the State introduced evidence that a defense witness, the defendant's brother, was incarcerated for a traffic offense. The court held that "[a]llowing the prosecutor to inform the jury about the brother's incarceration on a traffic offense served only to embarrass the only defense witness and discredit him. The brother's incarceration after an arrest for a traffic offense was merely a collateral matter which did not tend to affect his credibility." Id. at 562.

*470 B. APPLICATION OF LAW
Dessaure argues that the trial court erred when it allowed the State to impeach defense witnesses, William Birchard and Rodney Stafford, with evidence that they were serving mandatory life sentences. The defense presented the testimony of Birchard and Stafford to undermine the credibility of State witness Valdez Hardy. During the State's cross-examination of Birchard, the following exchange occurred:
Q. Sir, you have been convicted of five different felonies?
A. Yes.
Q. And all five of those occurred here in Pinellas County; right?
A. Yes.
Q. And, in fact, my office, my coworkers, prosecuted you for each and every one of those felonies, didn't we?
A. Yes.
Q. And we are currently responsible for you serving a life sentence right now?
The defense objected and moved for a mistrial, arguing that under section 90.610(1), the State could only introduce as impeachment evidence the number of felony convictions  not the length of a sentence served. The State argued that the mandatory life sentence was relevant because it showed that there was nothing the State could do if Birchard committed perjury. The State's line of questioning and argument to the court demonstrates that the State believed the question to be proper under section 90.608(2). The court denied the motion for mistrial and allowed the State to ask the question again. The following exchange occurred:
Q. You are currently serving a mandatory life sentence for those felonies; correct?
A. Yes, ma'am.
Q. And my office is responsible for the imposition of that sentence; correct?
A. Yes, sir.
Defense counsel also presented the testimony of Rodney Stafford. As with Birchard, the State asked Stafford whether he was currently serving a mandatory life sentence courtesy of the prosecutor's office. He responded that he was.
In most cases, witnesses with prior convictions may only be asked if they have ever been convicted of a felony and, if so, how many times. Fulton, 335 So.2d at 284. In this case, the jury was told by the defense that both Birchard and Stafford were incarcerated at the Pinellas County Jail. The prosecution then introduced evidence that Birchard and Stafford had been tried by members of the prosecutor's own office and that Birchard had been convicted of five felonies and Stafford had been convicted of four. On appeal, the State argues that Birchard and Stafford were biased because they had been prosecuted by coworkers in the prosecutor's office. Given the clear potential for bias against the State, Birchard and Stafford arguably had a motive to commit perjury at trial. The State's questions as to whether they were serving mandatory life sentences also were relevant to the fact that Birchard and Stafford could not be sanctioned for committing perjury. Essentially, they could lie with impunity. Because Birchard and Stafford had a potential motive to lie at trial, the State's questions concerning their life sentences and immunity from perjury sanctions were relevant and admissible under section 90.608(2). Therefore, the trial court did not abuse its discretion when it allowed the State to question Birchard and Stafford about the length of their sentences and denied the motion for mistrial.

IV. MOTION IN LIMINE REGARDING DESSAURE'S ARGUMENT WITH HIS FIANCEE
Dessaure argues that the trial court erroneously denied defense counsel's *471 motion to exclude the part of Dessaure's statement to police concerning a telephone argument he had with his fiancée, Mary Parent, shortly before the murder occurred. He argues that the argument was not relevant to his state of mind, as the State claimed, and was unfairly prejudicial because it showed his bad character in regard to matters not connected to the alleged murder.
Dessaure gave a taped statement to detectives in which he discussed a telephone argument he had with his fiancée, Mary Parent, shortly before the murder. Before trial, defense counsel filed a motion in limine to exclude evidence of this argument, arguing that the evidence was not relevant to any material fact in issue and prejudiced Dessaure by showing his bad character. The State argued that the evidence was relevant to show that Dessaure was angry and the argument was "part and parcel of what set him off." The State further argued that his reaction to this line of questioning and the change in his tone of voice was relevant. The court denied the motion in limine. Defense counsel renewed their objection at trial.
In his statement to police, Dessaure said that Parent telephoned him. At first he denied arguing with her. Upon further questioning, he admitted they argued with each other and that each of them had accused the other of cheating. Dessaure hung up on Parent but then called her back and continued the argument. The detectives accused Dessaure of being "pissed off" at the time of the murder because of the argument he had.
The State argues on appeal that the evidence is relevant because it showed a possible motivation for the murder, demonstrated Dessaure's tendency to give the detectives false information, and showed Dessaure's change in demeanor after being confronted with the argument. These arguments are well-founded. The murder occurred at most one to two hours after Dessaure's conversation with Parent, and Dessaure was, by his own admission, somewhat upset about the conversation. The change in his story to law enforcement also evidenced the giving of false information. Therefore, the trial court did not abuse its discretion in denying the motion in limine.

V. WAIVER OF RIGHT TO PENALTY PHASE JURY
Dessaure argues that he did not execute a valid waiver of his right to a penalty phase jury because he did not know that he had the right to have a jury determine whether the State proved sufficient aggravating circumstances to justify the imposition of the death penalty.
The record shows that Dessaure executed a written waiver of his right to a penalty phase jury. The trial court also conducted a colloquy to ensure that Dessaure understood the nature and importance of the rights he intended to relinquish. The court advised Dessaure that the waiver was irrevocable and against the advice of his attorneys.
This Court previously addressed a similar claim in Griffin v. State, 820 So.2d 906 (Fla.2002). The Court stated:
Consistent with our established practice in dealing with a plea-related voluntariness claim presented on appeal for the first time, we now hold the failure of a capital defendant to first attack the voluntariness of a waiver of a sentencing jury at the trial court precludes review on direct appeal. Hence, because of Griffin's failure to first challenge the waiver at the trial court, we cannot address his claim at this stage as he is restricted to collaterally attack the waiver through a postconviction motion.
*472 Id. at 913; see also Spann v. State, 857 So.2d 845 (2003). Dessaure never moved the trial court to withdraw his waiver of a penalty phase jury. Pursuant to Griffin, Dessaure's claim may not be raised on direct appeal but may be raised in a postconviction motion.

VI. RING CLAIMS
Dessaure asserts that the Florida death penalty statute is unconstitutional on its face because it requires aggravating circumstances to be found by the sentencing judge and not by the jury. This claim is foreclosed because Dessaure waived the right to a penalty phase jury. Even if he did not waive his right to a penalty phase jury, this Court has repeatedly addressed this argument and denied relief. See Jones v. State, 845 So.2d 55 (Fla.2003). Additionally, the aggravating factors in this case included Dessaure's prior violent felony conviction. Dessaure had previously been convicted of resisting arrest with violence. Dessaure admitted his guilt and was adjudicated guilty. The prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions. See Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Dessaure's claim is without merit.

VII. FAILURE TO CHARGE AGGRAVATING CIRCUMSTANCES IN THE INDICTMENT
Dessaure argues that the trial court's denial of Dessaure's motion to preclude the death sentence because aggravating circumstances were not alleged in the indictment and the subsequent imposition of the death sentence violated Dessaure's constitutional right to particularized notice of the nature and cause of the accusation. This Court has repeatedly held that this claim is without merit. See Blackwelder v. State, 851 So.2d 650 (Fla.2003); Porter v. Crosby, 840 So.2d 981 (Fla.2003).

VIII. SUFFICIENCY OF THE EVIDENCE
Although not raised by Dessaure, this Court independently reviews the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000).
Because the jury was instructed on both premeditated and felony murder and found Dessaure guilty on a general verdict form, the evidence must support either premeditated or felony murder. See Jones v. State, 748 So.2d 1012, 1024 (Fla.1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995)).
Here, there is sufficient evidence to support both theories of first-degree murder. The physical evidence in this case included the victim's blood found in Dessaure's pocket, Dessaure's semen found in the victim's apartment, his footprint found in her kitchen, and evidence of fifty-three stab wounds to Riedweg. Additionally, there was evidence that Dessaure entered Riedweg's apartment without permission and with the intent to commit a crime.
There is competent substantial evidence to support the jury's verdict on either theory of first-degree murder as well as burglary.

IX. PROPORTIONALITY
To determine whether death is a proportionate penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998).
The four aggravating factors in this case are: (1) prior violent felony conviction; (2) prior felony conviction and under sentence *473 of community control; (3) committed during a burglary; and (4) HAC. This Court has previously stated that HAC is one "of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). The court found five mitigating factors in this case: (1) Dessaure's age at the time of the murder; (2) his quality of being a caring parent; (3) his family background; (4) his capacity to form personal relationships; and (5) his behavior in court. The aggravating factors far outweigh the mitigating factors.
A review of the facts established in this case demonstrates the proportionality of the death sentence imposed. See White v. State, 817 So.2d 799 (Fla.) (finding death sentence proportionate when defendant stabbed victim fourteen times and slit her throat), cert. denied, 537 U.S. 1091, 123 S.Ct. 699, 154 L.Ed.2d 638 (2002); Singleton v. State, 783 So.2d 970 (Fla.2001) (stating that defendant's death sentence was proportionate in stabbing murder where the two aggravating factors of HAC and prior violent felony conviction outweighed statutory mitigators of extreme mental disturbance, inability to appreciate the criminality of conduct, the defendant's age, and nine nonstatutory mitigators); Mansfield v. State, 758 So.2d 636 (Fla.2000) (upholding death sentence where two aggravators  heinous, atrocious, or cruel and crime committed during the commission of a sexual battery  outweighed five nonstatutory mitigators). The death sentence in this case is proportionate.

CONCLUSION
We affirm Dessaure's first-degree murder conviction and death sentence.
It is so ordered.
WELLS, LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs in result only with an opinion, in which ANSTEAD, J., concurs.
QUINCE, J., concurs in result only.
PARIENTE, C.J., concurring in result only.
Although I concur in the affirmance of the murder conviction and death sentence in this case, I differ with the majority in its analysis on the alleged comment on silence and the evidence of Dessaure's argument with his girlfriend.
First, in its review of the issue concerning the alleged comment on silence, the majority employs the standard of review governing the denial of a motion for mistrial. Under that standard, the appellate court gauges whether the comment was so prejudicial as to vitiate the entire trial. Because defense counsel did not obtain an explicit ruling on his objection, the majority declines to examine the issue under the less deferential standard of review for an overruled objection. See majority op. at 465 n. 5. This is contrary to Parker v. State, 873 So.2d 270, 284 n. 10 (Fla.2004), in which we determined that harmless error analysis applies when the trial court denies a motion for mistrial after a prosecutor's misstatement in front of the jury and neither sustains the accompanying objection nor gives a curative instruction.
Further, I conclude that the trial court did rule on defense counsel's objection. Although the judge did not state "objection overruled," his comments during the bench conference on defense counsel's objection to the prosecutor's remark during opening statement had the effect of overruling the objection. The judge stated, "I don't think *474 that's an inference on the right to remain silent," and subsequently denied the motion for mistrial. In substance, the court ruled that not only did the comment fall short of the standard for granting a mistrial, but that it was a proper comment on the evidence, and thus not objectionable. Cf. Carratelli v. State, 832 So.2d 850, 857 (Fla. 4th DCA 2002) (distinguishing prior decision holding issue preserved despite absence of explicit ruling on objection as "a case where the judge's verbal response to the objection and his subsequent conduct left no doubt as to the ruling"), review denied, 848 So.2d 1153 (Fla.2003).
Thus, the issue should be analyzed to determine whether the trial court erred in overruling the objection, and if so, whether the error was harmless. See Rodriguez v. State, 753 So.2d 29, 39 (Fla.2000) (stating that where an objection is sustained, the standard of review is whether the trial court abused its discretion in denying a motion for mistrial, but where an objection is erroneously overruled, the issue is whether the comment is harmless beyond a reasonable doubt). On this question, I agree with the majority that the prosecutor's remark was fair comment on the evidence. Thus, the objection was properly overruled.
Next, I disagree with the majority's conclusion that the evidence of Dessaure's argument with his girlfriend on the day of the killing was relevant to show his motive  anger  in killing the victim in this case, as well as to illustrate his tendency to give false information and show his change of demeanor upon being questioned about the argument. The majority cites no precedent justifying the admission of this evidence for any of these purposes. As to motive, there was no nexus established between Dessaure's argument with his girlfriend and the murder. As to his reaction upon being questioned about the argument, irrelevant evidence is not transformed into relevant evidence simply by becoming the subject of police interrogation. Apart from a generalized "res gestae" view of relevant admissible evidence, which this Court has cautioned against, see Bryan v. State, 533 So.2d 744, 746 (Fla.1988), I see no basis for introducing evidence of an argument between Dessaure and his girlfriend that was unrelated to the killing of his neighbor. However, because the State presented significant DNA evidence linking Dessaure to the crime, and did not assert in closing argument that the argument with his girlfriend was Dessaure's motive for the murder, I conclude that any error in admitting this irrelevant evidence is harmless beyond a reasonable doubt.
ANSTEAD, J., concurs.
NOTES
[1] The jury, utilizing a general verdict form, found Dessaure guilty of first-degree murder as charged. It did not specify whether he was found guilty of premeditated first-degree murder, felony first-degree murder, or both. However, the jury was instructed as to both premeditated murder and felony murder.
[2] At the time of the murder, Dessaure was on community control for a conspiracy to commit armed robbery. He was arrested for violating his community control.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] The nonstatutory mitigators are: (1) Dessaure was twenty-one years old (some weight); (2) Dessaure has the capacity and desire to be a loving parent (little weight); (3) Dessaure's family life was dysfunctional while he was growing up, his parents abandoned him to be raised by his grandmother, and his older brother died in a traffic accident (some weight); (4) Dessaure has the capacity to form personal relationships (little weight); and (5) Dessaure was well behaved in court (little weight).
[5] We recognize that the proper standard of review for an overruled objection is a harmless error standard. See Rodriguez v. State, 753 So.2d 29, 39 (Fla.2000); State v. DiGuilio, 491 So.2d 1129, 1137 (Fla.1986). However, that standard does not apply here because the trial judge never expressly ruled on the defense counsel's objection. Instead, he denied counsel's motion for a mistrial. He did so because defense counsel simultaneously objected to the State's opening statement and moved for a mistrial. Defense counsel never waited for or requested a ruling on his objection prior to moving for a mistrial. Nonetheless, as we discuss, the comment was fair comment on the evidence and the objection, if expressly ruled upon, properly would have been overruled.