991 So.2d 364 (2008)
Neil K. SALAZAR, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-1381.
Supreme Court of Florida.
July 10, 2008.
Rehearing Denied September 17, 2008.
*367 Carey Haughwout, Public Defender, and Gary lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Neil Salazar appeals from a judgment of conviction and sentence of death for the first-degree murder of Evelyn Nutter. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm Salazar's conviction and sentence.

*368 FACTS AND PROCEDURAL HISTORY
In the mid-1990s, Ronze "June Bug" Cummings and his girlfriend, Evelyn "Jenny" Nutter, moved from Fort Lauderdale to Fort Drum. The couple lived in a house adjacent to an orange grove where Ronze worked as the foreman. While living in Fort Drum, Nutter gave birth to two children. The children were ages two and six at the time of the killing.
Neil Salazar was a friend of Ronze Cummings. The two previously worked together in Fort Lauderdale at Smurfit Recycling Plant. Around May to June of 2000, Salazar, his girlfriend Monica, and their young child came to live with Ronze and Nutter in Fort Drum. But after a few weeks, they moved out at Ronze's request.
Subsequently, on June 26, 2000, Julius Hatcher, an associate of Salazar's, visited the Miami home of his cousin, Fred Cummings.[1] Neither Fred nor his girlfriend, Shirleen Baker, was home. Instead, Salazar answered the door. Salazar invited Hatcher in and told him he had something to show him under an upstairs bed. Hatcher went upstairs and looked under the bed, but saw nothing. When he turned around, Salazar confronted him, pointing a machine gun at him. Salazar accused Hatcher of being "too clean" and "a snitch" who was planning to turn him over to the FBI regarding his drug trafficking business. Salazar duct-taped Hatcher's arms and legs and shoved his head under the bed, where he remained for several hours. Subsequently, Fred and Baker arrived home, but they did nothing to help Hatcher. Several hours later, Salazar brought Hatcher outside and forced him into a green Buick which Baker had rented. Then, Baker drove north on Interstate 95 with Hatcher in the front seat and Salazar sitting behind Hatcher, holding the machine gun. When the trio passed through Pompano Beach, Salazar removed the duct tape that bound Hatcher.
Around 11 p.m., they arrived at the home of Ronze and Nutter in Fort Drum. Hatcher went with Salazar to the back door. Salazar twisted out the back porch light bulb and broke the lock on the back door. When they entered the house, Ronze and Nutter were sitting in the living room watching television with their two-year-old son.[2] Salazar ordered the occupants to lie on the floor and had Hatcher bind their hands and feet with the duct tape he brought with him from Miami. For about fifteen to twenty minutes, Salazar ranted about how his business was falling apart and accused the couple of communicating with the FBI. Salazar said that before he left, "somebody die tonight." Salazar also threatened to kill Hatcher if he refused to cooperate with Salazar's orders. Next, Salazar told Hatcher to retrieve some plastic shopping bags from a kitchen cabinet and a steak knife from a kitchen drawer. Salazar directed Hatcher to place the bags on Ronze's and Nutter's heads. Hatcher placed the bags on their heads but also poked a hole in Ronze's bag so he could breathe. Although Hatcher told Ronze that he would poke a breathing hole in Nutter's bag, no such hole was found when her bag was later recovered from the crime scene. Salazar then told Hatcher to *369 duct-tape the bottom of the bags around the victims' necks, and Hatcher complied. Hatcher also duct-taped Nutter's eyes and mouth near her nose. Then, Salazar instructed Hatcher to move Ronze and Nutter into separate bedrooms.
Finding that the victims had not yet suffocated, Salazar ordered Hatcher to cut their throats with the knife. Hatcher refused. Then, Salazar gave Hatcher a .38 caliber revolver and ordered him to hold a pillow over each victim's head and shoot through the pillow. Salazar first stood in the doorway to the room where Nutter was placed, holding the machine gun on Hatcher. Hatcher shot Nutter in the head through a pillow as ordered. He then moved to the room in which Ronze was placed and Salazar stood in the doorway with the machine gun. Hatcher told Ronze to play dead before shooting him in the head through a pillow as Ronze's two-year-old son sat beside him. Still alive, Ronze stood up. Salazar ordered Hatcher to shoot him again, and Hatcher complied. Although still alive, Ronze remained on the floor, pretending to be dead.
Then, Salazar gave Hatcher the keys to a white Buick which belonged to Ronze and Nutter and told Hatcher to follow him and Baker back to Miami. Salazar and Baker sped off without waiting for Hatcher, but Hatcher was able to catch up to them by following the taillights. Hatcher followed Salazar and Baker until they reached Interstate 95. Soon thereafter, Hatcher signaled that he was stopping to purchase gasoline. Later, Hatcher drove the car to Fred's house in Miami and spent the night in a motel.
After Salazar and Hatcher went outside, but prior to their departure, Ronze stood up, picked up his son, and checked on Nutter, finding her dead. Ronze then moved to the living room and looked out the window. He observed Salazar, Hatcher, and Baker standing near the vehicles. After the trio left the premises, Ronze attempted to call 911 from his home phone but found that the line was disconnected. Carrying his son, Ronze walked to the nearby orange grove office and called 911. Ronze told the 911 operator that three or four Jamaican men broke into his home, killed Nutter, and shot him.
Around 12:30 a.m., Deputies Joey Chapman and Javier Gonzalez of the Okeechobee County Sheriff's Department arrived at the home. They spotted Ronze in his pickup truck and followed him to the house. When they approached Ronze, he appeared nervous and was bleeding profusely from his face. A torn bag hung around his neck, and pieces of duct tape clung to his wrists, feet, and arms. Ronze's two-year-old son was with him. Ronze informed the deputies that Nutter, whom he referred to as his wife, had been killed. When the deputies asked who the perpetrator was, Ronze told them that "Neil" did it. Ronze was subsequently transported by helicopter to Holmes Regional Medical Center in Melbourne, Florida.
Detective T.J. Brock of the Okeechobee County Sheriff's Office obtained sworn statements from Ronze while he was in the hospital and upon his release. During both interviews, Ronze identified "Neil" as the perpetrator. Ronze told Brock that he had worked with Neil at a recycling plant when he lived in Fort Lauderdale and that Neil had come to live with him in the weeks prior to the crimes. Brock presented Ronze with several photographic lineups, but Salazar's photograph was not among those presented. To assist Brock, Ronze retrieved a videotape from his home which depicted Salazar, Monica, Ronze, Nutter, and their children at the beach during the time period that they lived together. Ronze informed Brock that Neil *370 was not the actual shooter but ordered another man to carry out the killing.
About one week after Ronze was released from the hospital, Hatcher went to the Miami-Dade Police Department and gave a statement regarding the shooting. During a July 5, 2000, taped interview with Detective Brock, Hatcher confessed to the crimes. His confession was largely consistent with Ronze's description of the events surrounding Nutter's death.
On July 19, 2000, Hatcher and Salazar were charged by indictment with: (1) the first-degree murder of Evelyn Nutter; (2) the attempted first-degree murder of Ronze Cummings; (3) burglary of a dwelling while armed; and (4) theft of a motor vehicle. Hatcher's trial was postponed when he agreed to testify against Salazar in exchange for the State's promise not to seek the death penalty in his case.
Salazar's trial commenced on March 6, 2006. During the State's case, Dr. Frederick Hobin, the medical examiner who performed Nutter's autopsy, testified that Nutter died as the result of "multiple episodes of violence," the more lethal of which was the bullet injury to her head. According to Dr. Hobin, had Nutter not been shot, she would have certainly died from asphyxiation as a result of the bag over her head and the duct tape on her face. Following the State's case, the defense rested without presenting any evidence or witnesses.
On March 9, 2006, the jury returned guilty verdicts with special interrogatories, convicting Salazar of: (1) the first-degree murder of Evelyn Nutter while carrying, displaying, or using a firearm under both the premeditated and felony murder theories; (2) the attempted first-degree murder of Ronze Cummings; (3) burglary during which an assault was committed; and (4) theft of a motor vehicle. After the penalty phase, the jury unanimously recommended death. Finding four aggravators,[3] no statutory mitigators, and six nonstatutory mitigators,[4] the trial court followed the jury's recommendation and sentenced Salazar to death.

DISCUSSION
On appeal, Salazar raises five issues: (1) whether the trial court erred in denying Salazar's motion for a mistrial based on improper prosecutorial comments during guilt-phase final arguments; (2) whether the trial court erred in allowing the State to present improper self-bolstering witness testimony; (3) whether the trial court erred in finding the cold, calculated, and premeditated (CCP) aggravator; (4) *371 whether the trial court erred in allowing the State to argue during penalty phase closing arguments that the victims were terrorized; and (5) whether Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition, we independently determine: (6) whether sufficient evidence supports Salazar's convictions; and (7) whether Salazar's death sentence is proportionate. We address each of these issues in turn.

Improper Guilt Phase Prosecutorial Argument
Salazar argues that the trial court erred in denying his motion for a mistrial based on improper prosecutorial comments during guilt phase final arguments. We disagree and affirm the trial court's ruling.
During the guilt phase final arguments, the prosecutor attempted to explain that the State made a deal with Hatcher because it was concerned that there would be another attempt on Ronze Cummings' life if Salazar was not convicted. Specifically, the prosecutor said:
You may or may not like the deal, you may or may not like the concept that the State would give the shooter in this case some consideration, give him his life; not give him his freedom, give him his life. Nobody is happy about having to make any accommodation. But this is the real world, and if Hatcher is not available to the state as a witness, the person who did this act, who directed this act, who had it done and who not only took the life of one person, tried to take the life of another person, and for all practical purposes has taken the life of Hatcher by putting him in a position where he's committed an offense that will put him in prison, I'm sure, for the rest of his life, would walk. He could have walked out of here. So we made this case a little bit better by bringing the other person who made a statement real early saying that Neil was the one directing everything.
We also did something else by doing that. We've had in this case a man come from Miami with another man, broke into a house, killed one person, certainly left there thinking they had killed two people, people they knew, people they had been friendly with, he (indicating) had been friendly with, and we have at the outset Ronze Cummings who has survived and who is alive today, six years later, and would the State in this circumstance have a reasonable concern that there could be another attempt on Ronze's life, attempt to finish him
At that point, the defense objected and a sidebar discussion was held.
At sidebar, defense counsel moved for a mistrial, arguing that the State's comments referred to facts not in evidence and appealed to the sympathy of the jury. The trial judge sustained the defense's objection but denied the motion for mistrial. Then, defense counsel requested a curative instruction. The trial judge denied the request "on the basis that ... it would just highlight [the erroneous comment] that much more." Defense counsel agreed, indicating that he only requested the curative instruction because he believed it was necessary to preserve the issue for appeal. When final arguments resumed, the State closed the issue by asking the jury to focus on the reasonableness of Hatcher's testimony and whether it was consistent with other evidence in the case.
We have repeatedly held that this Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard. See England v. State, 940 So.2d 389, 402 (Fla.2006) ("A trial court's ruling on a motion for mistrial is *372 subject to an abuse of discretion standard of review."); Perez v. State, 919 So.2d 347, 363 (Fla.2005) ("[A] trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review." (quoting Goodwin v. State, 751 So.2d 537, 546 (Fla. 1999))); Floyd v. State, 913 So.2d 564, 576 (Fla.2005); Ricks v. Loyola, 822 So.2d 502, 506 (Fla.2002) (holding that "trial courts have broad discretion when ruling on motions for new trial and motions for mistrial"); Ford v. State, 802 So.2d 1121, 1129 (Fla.2001) ("A trial court's ruling on a motion for a mistrial is within the sound discretion of the court and will be sustained on review absent an abuse of discretion."); Snipes v. State, 733 So.2d 1000, 1005 (Fla.1999) ("A decision on a motion for a mistrial is within the discretion of the trial judge and such a motion should be granted only in the case of absolute necessity."); Power v. State, 605 So.2d 856, 861 (Fla.1992) ("Ruling on a motion for a mistrial is within the sound discretion of the trial court."). "A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial." Cole v. State, 701 So.2d 845, 853 (Fla.1997). Stated differently, "[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." England, 940 So.2d at 401-02; see Hamilton v. State, 703 So.2d 1038, 1041 (Fla.1997) ("A mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial."). Under the abuse of discretion standard, a trial court's ruling will be upheld unless the "judicial action is arbitrary, fanciful, or unreasonable.... [D]iscretion is abused only where no reasonable [person] would take the view adopted by the trial court." Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (second alteration in original) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)). Thus, "[i]n order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Spencer v. State, 645 So.2d 377, 383 (Fla.1994).
We conclude that while the prosecutor's comments were improper, they were not so prejudicial as to deny Salazar a fair trial. The defense objection interrupted the prosecutor in mid-sentence before the argument was developed, and the trial court sustained the objection at sidebar. Following the sidebar conference, the prosecutor abandoned the argument. Given these circumstances, the trial court did not abuse its discretion in denying Salazar's motion for mistrial. Cf. Merck v. State, 664 So.2d 939, 941 (Fla.1995) (holding that the trial court did not abuse its discretion in denying motion for mistrial based upon an isolated reference to the first trial of the case). The comments were not likely to "inflame the minds and passions of the jurors" such that their verdict and sentencing recommendation reflect "an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985); see Kearse v. State, 770 So.2d 1119, 1130 (Fla.2000). Moreover, as to not giving the curative instruction, the trial court had the discretion not to give a curative instruction if it believed that doing so would draw further attention to the improper comment. See Israel v. State, 837 So.2d 381, 389 (Fla. 2002) (holding that the trial court, which refused to admonish the jury so that no further attention would be drawn to the error, "was well within its discretion to *373 determine that the statement did not prevent Israel from receiving a fair trial").

Improper Self-Bolstering Witness Testimony
Next, Salazar argues that the trial court committed reversible error when it overruled his objection to Detective Brock's testimony that he was "trying to find the truth" in his investigation. Salazar claims that, by making that statement, Detective Brock improperly bolstered his own credibility. We affirm the trial court's ruling.
During the guilt phase of Salazar's trial, Detective Brock testified that he conducted an extensive investigation, interviewing between fifty and one hundred people. Regarding Detective Brock's investigation, the following dialogue between Brock and the State transpired:
[By the Prosecutor]
Q: Detective Brock, I think you testified you were in the Miami area, you were in the Okeechobee area, obviously the Fort Drum area, other parts of Okeechobee maybe. You talked to people in Melbourne?
A: Yes.
Q: Your investigation was physically wide ranging, and wide ranging in terms of the number of people you talked to?
A: Yes.
Q: Okay. It's appropriate for a homicide case; right?
A. Absolutely.
Q: Okay. No rush to judgment?
A: Right.
Q: No sudden  no quick once-over in a homicide case?
A: Just trying to find the truth.

Q: Yes, sir.
[Defense Counsel]: Objection, Your Honor. Can we approach?
The Court: No, I'll overrule the objection.
(Emphasis added.)
Later, while Brock was still on the stand but outside the jury's presence, defense counsel sought to clarify its objection and moved for a mistrial, citing Acosta v. State, 798 So.2d 809 (Fla. 4th DCA 2001). The trial court denied the motion for mistrial, explaining that Detective Brock merely asserted that his goal was to find the truth. By contrast, the detective's comment in Acosta expressed an opinion that what he found in his investigation was the truth. The trial court also stated that in context, Detective Brock's statement was relevant to contradict a potential defense that law enforcement authorities rushed to decide that Salazar was the main perpetrator.
We review the trial court's ruling for abuse of discretion. As we recently stated:
This Court reviews evidentiary rulings for abuse of discretion. A judge's discretion is limited by the rules of evidence, Johnston v. State, 863 So.2d 271, 278 (Fla.2003), and by the principles of stare decisis. Cf. Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) ("Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic nor reasonableness."). A trial court ruling constitutes an abuse of discretion if it is based "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).
Johnson v. State, 969 So.2d 938, 949 (Fla. 2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008).
The trial court did not abuse its discretion in denying Salazar's objection and *374 motion for mistrial. As the trial court correctly noted at sidebar, Acosta is distinguishable because Detective Brock merely stated that he was trying to find the truth in his investigation; he did not claim that what he found was the truth. Also, Detective Brock's credibility was not central to the State's case. Cf. Olivera v. State, 813 So.2d 996, 998 (Fla. 4th DCA 2002) (holding that it was harmful error for a key State witness to insinuate that he had passed a lie detector test where the defense thoroughly impeached the witness's credibility reasoning that "unless the jury believed that he had passed the lie detector test, it is hard to fathom that his testimony would have led to the defendant's conviction as there were no other witnesses or physical evidence linking the defendant to the crime"). Detective Brock expressed no opinion as to the credibility of other witnesses. Cf. Acosta, 798 So.2d at 810 (holding that it was harmful error for a police officer to vouch for the credibility of another witness); Paul v. State, 790 So.2d 508 (Fla. 5th DCA 2001) (remanding for reconsideration of whether defense counsel was ineffective for failing to object to State investigator's comments on the truthfulness of the child sexual abuse victim). Further, Brock's testimony was not offered as evidence of his unimpeached good character for veracity. Cf. Whitted v. State, 362 So.2d 668 (Fla.1978) (holding that it was error to allow evidence of a witness's good character for veracity unless it has been impeached but declining to express an opinion as to whether error was reversible). Rather, the statement was made in response to the State's questioning regarding whether Brock conducted a thorough investigation and whether law enforcement authorities rushed to judgment against Salazar.
Accordingly, we affirm the trial court's ruling on Salazar's objection to Detective Brock's testimony that he was "trying to find the truth" in his investigation.[5]

CCP Aggravator
Salazar next argues that the trial court erred in finding the CCP aggravator. We disagree and affirm the trial court's CCP finding.
When evaluating claims alleging error in the application of aggravating factors, this Court does not reweigh the evidence to determine whether the State proved each factor beyond a reasonable doubt. See Alston v. State, 723 So.2d 148, 160 (Fla.1998). Rather, "[o]ur review of a trial court's finding of an aggravating factor is limited to determining whether the trial court applied the right rule of law and, if so, whether competent, substantial evidence supports its finding." Hutchinson v. State, 882 So.2d 943, 958 (Fla.2004). "When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court...." Occhicone v. State, 570 So.2d 902, 905 (Fla.1990).
This Court has established a four-part test to determine whether the CCP aggravating factor is justified: (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification. Evans v. State, 800 *375 So.2d 182, 192 (Fla.2001) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). Further, this Court has noted that "[t]he facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course." Looney v. State, 803 So.2d 656, 678 (Fla.2001) (quoting Rodriguez v. State, 753 So.2d 29, 48 (Fla.2000)).
The trial court applied the correct rule of law and competent, substantial evidence supports its finding. In its sentencing order, the trial court stated the following:
In order to find [the CCP] aggravator, the State must show a heightened level of premeditation to commit the killing. An unnecessary, execution type, killing is the type of killing for which this aggravator was intended. [See Chamberlain v. State, 881 So.2d 1087 (Fla.2004).] The facts of the case, as recounted throughout this sentencing order, as well as the jury verdict interrogatory, clearly show that it has been proven that the Defendant had a premeditated design to kill the victim. The heightened level of premeditation and cold, calculated, nature of the killing has also been proven by the facts showing that the Defendant had a well planned murder. The time, place, manner of killing, and preparation was all thought out with [a] cold and calculated plan. The victim was not threatening the Defendant. The victim gave no resistance. The victim's infant child was present. The Defendant directed each event that occurred without any justification. The plan included:
 Driving from Miami-Dade County to a rural section of Okeechobee County where the victim lived, during the nighttime hours.
 Bringing another person who the Defendant had control over to commit the violence.
 Unscrewing the porch light bulb before entering the home.
 Disconnecting the phone in the victim's home upon entry into the home.
 Bringing two firearms, one for the Defendant and one for the co-Defendant, which the Defendant did not give him until it was time for the killing.
 Bringing duct tape for tying the victim up and to cover her eyes and mouth.
 Planning to use plastic bags to increase the terror of the victim.
 Planning to cause a slow death by asphyxiation with the duct tape and bags, only to then state that it was "taking too long," at which time the Defendant directed the co-Defendant to "cut their throats," to then, after the co-Defendant refused, directing the co-Defendant to separate the victims, put a pillow over their heads and shoot them. When the other victim (Ronze Cummings) didn't die after the first shot, the Defendant told the co-Defendant to "shoot him again," and he did.
 Having the other person do acts which may leave his fingerprints, DNA, or other items of evidence at the scene, while the Defendant kept evidence of his presence to a minimum.
 Apparently not committing any type of theft from the victim, except the automobile.
 Having the other person drive the victim's car from the scene, while the Defendant quickly drove off, leaving the co-Defendant to catch up or get lost in Okeechobee County, *376 while being in possession of the deceased['s] car.
The Court finds this aggravator has been proven and assigns great weight to it.
First, Nutter's murder meets the "cold" element of CCP because it was an execution-style killing. See Ibar v. State, 938 So.2d 451, 473 (Fla.2006) (citing Lynch v. State, 841 So.2d 362 (Fla.2003); Walls v. State, 641 So.2d 381, 388 (Fla.1994)); see also Looney, 803 So.2d at 678 (noting the significance of the fact that the victims were bound and gagged, and thus could not offer any resistance or provocation). In addition, after putting the plastic bag over Nutter's head and moving her to the bedroom, Salazar "had ample opportunity to reflect on [his] actions and abort any intent to kill." Ibar, 938 So.2d at 473. But instead he ordered Hatcher to cut Nutter's throat and to shoot her in the head through a pillow.
"As to the `calculated' element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of `calculated' is supported." Lynch, 841 So.2d at 372. Here, Salazar possessed two guns and duct tape as he traveled to Fort Drum. Upon arriving at the home of Ronze and Nutter, Salazar ordered Hatcher to bind the couple's hands and feet, tape plastic bags over their heads, and move them into separate bedrooms. When they did not quickly die of asphyxiation, Salazar ordered Hatcher to cut their throats. When Hatcher refused, Salazar gave him the .38 caliber revolver and ordered him to shoot Ronze and Nutter in the head through a pillow. Clearly, in this case, a finding of the "calculated" element was proper. Cf. Ibar, 938 So.2d at 473 (finding the "calculated" element where the perpetrators brought semiautomatic handguns, entered through the back door of the residence, and shot the three victims in the back of the head); Walls, 641 So.2d at 384-87 (finding "calculated" element where Walls left his first victim, weapon in hand, then returned to the place where he had left his other victim bound and gagged, taunted and abused her, and then shot her to death).
Third, the "heightened premeditation" element is also supported by competent, substantial evidence. This Court has "previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Alston, 723 So.2d at 162. Salazar had ample opportunity to leave the crime scene and not kill Evelyn Nutter. Despite this time to reflect, Salazar ordered Hatcher to shoot Nutter in the head, execution-style, killing her.
Salazar argues that his intent to kill was not formed until after his original purpose, to "get answers," was thwarted. We recently rejected a similar argument. See Carter v. State, 980 So.2d 473, 478 (Fla. 2008) (affirming the trial court's CCP finding where defendant argued that his original purpose in entering the victims' home armed with a .22 caliber rifle was to "[get] some answers"). Salazar's preconceived intent to kill Nutter by asphyxiation was apparent when he asked Hatcher if Nutter and Ronze were dead yet. It was also evidenced by his expression of frustration at the length of time it took for the victims to die and the multiple attempts made to kill them.
The final element of CCP is a lack of legal or moral justification. "A pretense of legal or moral justification is `any colorable claim based at least partly on uncontroverted and believable factual evidence *377 or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.'" Nelson v. State, 748 So.2d 237, 245 (Fla.1999) (quoting Walls, 641 So.2d at 388). In this case, there is no legal or moral justification posited for the killing.
Thus, the CCP aggravator was properly found.[6]

Improper Penalty Phase Prosecutorial Argument
Next, Salazar claims that the trial court erred in overruling his objection to the State's use of the word "terrorize" during penalty phase final arguments. We deny this claim.
During penalty phase closing arguments, the prosecutor argued:
In this case, we have a burglary by two men who come two and a half ... hours from Miami, ... and they come, park the car, go down the road, come up on the house in the middle of the night, well after dark, break the door in.... Pushed their way basically into the house and held everybody at gunpoint and terrorized the two occupants until their decision or until the actions were taken to kill them.
Burglary and a lot of other things we talked about earlier are bases for felony murder and basically the thinking behind all that is you put somebody else's life on the line, you create a dangerous situation where somebody else could be killed, and even if it's an accident, it's felony murder.
Here we have much, much more than just a burglary that went bad. We have a burglary for the purpose of terrorizing the occupants and maybe a burglary for killing the occupants. You'll make the determination, and probably have, "When was the decision to kill made? Was it made before they came up? Was it made before, you know, Neil Salazar went in that house? Wasor was it made at some point" I mean, the statement was made "If I don't get some answers, people are going to die." Clearly at some point the decision to kill replaced that of simply terrorizing them.
They came with the duct tape and Neil Salazar came armed with the knowledge that those Wal-Mart bags were there in the house because he had lived there. They clearly or he clearly had knowledge
(Emphasis added.) At that point, the defense objected and a brief sidebar conference was held. Defense counsel argued that by saying "terrorize" the State was arguing a nonstatutory aggravator. The trial court overruled the objection.
The trial court did not abuse its discretion in overruling Salazar's objection. "It is within the court's discretion to control the comments made to a jury, and a court's ruling will be sustained on review absent an abuse of discretion." Ford, 802 So.2d at 1132. Contrary to Salazar's argument, the State's use of the word "terrorize" was not improper and did not refer to nonstatutory aggravation. In context, the argument specifically referred to the burglary statutory aggravator and alluded to two other statutory aggravators, namely HAC and CCP.
*378 First, the prosecutor's use of the word "terrorize" referred to the underlying assault supporting the burglary aggravator. "An `assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." § 784.011(1), Fla. Stat. (2000). Similarly, "terror" is defined as "a state of intense fear," and to "terrorize" is "to coerce by threat or violence." Merriam-Webster's Collegiate Dictionary at 1213 (10th ed.2001). Accordingly, the trial court did not abuse its discretion in allowing the prosecutor to use the word "terrorize" when referring to the assault underlying the burglary aggravator.
Second, the State's argument alluded to both the HAC and CCP aggravators. "[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may be considered in determining whether [the HAC] aggravator is satisfied...." Pooler v. State, 704 So.2d 1375, 1378 (Fla.1997) (emphasis added). And the question of whether Salazar's original purpose for entering Nutter's home was to "terrorize" her or to kill her relates to the "heightened premeditation" element of CCP.
Accordingly, the trial court did not abuse its discretion in overruling Salazar's objection to the State's use of the word "terrorize" during penalty phase final arguments.

Ring v. Arizona
Salazar next asserts that his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We disagree. Ring is satisfied in this case because the trial court applied the prior violent felony conviction aggravator based on Salazar's conviction for the contemporaneous attempted murder of Ronze Cummings. See Perez, 919 So.2d at 377; Jones v. State, 855 So.2d 611, 619 (Fla.2003). Also, because the jury found Salazar guilty of burglary and attempted murder, it found the facts supporting the trial court's application of the "during the course of a felony" aggravator. See Troy v. State, 948 So.2d 635, 653 (Fla. 2006) (denying Ring relief because the trial court found the "during the course of a felony" aggravator based on the jury's verdict finding defendant guilty of two counts of armed burglary, two counts of armed robbery, and attempted sexual battery in addition to first-degree murder), cert. denied, ___ U.S. ___, 127 S.Ct. 2981, 168 L.Ed.2d 711 (2007); Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004) ("This Court has held that the aggravator[ ] of murder committed `during the course of a felony'... [was] already submitted to a jury during the trial and, hence, [is] in compliance with Ring.").[7] Accordingly, Salazar's sentence is not unconstitutional under Ring.

Sufficiency of the Evidence Supporting Salazar's Conviction
Although not argued by Salazar, we independently review the record to determine whether competent, substantial evidence exists to support Salazar's first-degree *379 murder conviction. See Guardado v. State, 965 So.2d 108, 118 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1250, 170 L.Ed.2d 90 (2008); Buzia v. State, 926 So.2d 1203, 1217 (Fla.2006). Upon a thorough review of the evidence presented at trial, we hold that sufficient evidence supports Salazar's conviction under both premeditated and felony murder theories. Specifically, Ronze Cummings, who had worked and lived with Salazar, identified him as the mastermind. Ronze explained that Salazar and Hatcher broke into his house on the night of the murder and held him and Nutter at gunpoint. According to Ronze, Salazar told them "somebody die tonight." Then, Salazar made three separate attempts to murder the victims, including ordering Hatcher to (1) asphyxiate them with plastic bags and duct tape; (2) slit their throats; and (3) shoot them in the head through a pillow. The last of these attempts was successful as to Nutter. Further, Hatcher testified that Salazar forced him to travel to Fort Drum at gunpoint. Consistent with Ronze's account, Hatcher testified that Salazar broke into Ronze's house, threatened to kill the victims, and then ordered Hatcher to kill them or be killed himself. Ronze's and Hatcher's testimony is consistent with the evidence collected at the crime scene and the findings of Detective Brock's investigation. Accordingly, sufficient evidence supports Salazar's first-degree murder conviction.

Proportionality
Although Salazar does not raise the issue of proportionality, this Court has an independent obligation to perform a proportionality review. See England, 940 So.2d at 407. "Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (citation omitted).
We hold that the imposition of the death penalty in this case is not disproportionate to other cases decided by this Court. See, e.g., Walker v. State, 957 So.2d 560, 585 (Fla.2007) (determining that the death sentence was proportionate where three aggravators (during the course of a felony, HAC, and CCP) outweighed four nonstatutory mitigators (defendant's drug use/bipolar personality/sleep deprivation, codefendant's life sentence, defendant's statement to police, and defendant's remorse)); Delgado v. State, 948 So.2d 681, 691 (Fla.) (affirming the death sentences where the three aggravators (HAC, CCP, and prior violent felony conviction) outweighed four nonstatutory mitigating circumstances (non-use of drugs or alcohol, difficult childhood and physical/emotional abuse at the hands of defendant's parents, stepfather, the Cuban government, and neighbors, defendant's love of his family, and good behavior throughout the trial)), cert. denied, ___ U.S. ___, 127 S.Ct. 3016, 169 L.Ed.2d 738 (2007); Johnston v. State, 863 So.2d 271, 286 (Fla.2003) (affirming death sentence where two aggravators (prior violent felony conviction and HAC) outweighed one statutory mitigator (substantially impaired capacity) and twenty-six nonstatutory mitigators); see also Pearce v. State, 880 So.2d 561, 577 (Fla.2004) (holding the death penalty proportionate where the defendant, though not the person actually committing the murder, was the mastermind or dominating force behind the murder); Chamberlain v. State, 881 So.2d 1087, 1108-09 (Fla.2004) (holding the death penalty proportionate where the defendant, though not the actual killer, participated in the robbery and actively pursued and encouraged the murders of the victims); Stephens v. State, 787 So.2d *380 747, 759-61 (Fla.2001) (holding death sentence proportionate where defendant did not actually commit murder, but personally committed crimes of burglary and robbery and displayed reckless disregard for human life); Van Poyck v. State, 564 So.2d 1066, 1070-71 (Fla.1990) (holding the death penalty proportionate where the defendant was the instigator and primary participant in the underlying crimes, came to the scene "armed to the teeth," and knew lethal forces could be used). Accordingly, Salazar's death sentence is proportionate.

CONCLUSION
For the foregoing reasons, we affirm Salazar's conviction and death sentence.
It is so ordered.
QUINCE, C.J., and WELLS, ANSTEAD, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which ANSTEAD, J., concurs.
BELL, J., specially concurs with an opinion, in which WELLS and CANTERO, JJ., concur.
PARIENTE, J., specially concurring.
I agree with the majority's decision to affirm the conviction and sentence in this case. I write to respond to Justice Bell's special concurrence because it is important to once again clarify the different methods of preserving error in the trial court and the applicable appellate standards of review, which vary depending on both the nature and disposition of the objection by the trial judge. Certainly, we all agree that the Court strives to provide standards that are easy for trial lawyers to follow, for trial courts to apply, and for appellate courts to review.
When it comes to a perceived error at trial, we have urged lawyers to not only object but to also apprise the trial court of the specific nature and grounds upon which the objection is based. See Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982), and its progeny. As the Court has often stated, "[t]o preserve error for appellate review, the general rule requires that a contemporaneous, specific objection occur at the time of the alleged error." Overton v. State, 976 So.2d 536, 547 (Fla. 2007) (citing F.B. v. State, 852 So.2d 226, 229 (Fla.2003), and Steinhorst, 412 So.2d at 338). However, this requirement, which is necessary to preserve the issue for appellate review, is not always easy to apply in the real world of courtrooms. Judges frown on speaking objections and often both lawyers and trial judges do not want the jury to hear the argument on the objection because of a legitimate concern that a discussion in front of the jury may only highlight the error.[8] Yet, a properly articulated specific objection is necessary not only for appellate preservation but to assist the trial court in making a proper ruling as well. Therefore, to address the tension between the need for a specific objection and the desire to shield the jury from the argument, often either the trial judge or the lawyer will ask that the objection *381 be heard at sidebar. That is exactly what happened in this case.
During closing argument, the prosecutor commented that one reason the State made a deal with the codefendant in this case was to ensure Salazar was convicted, because there could have been another attempt made on the surviving victim's life. Defense counsel immediately objected and requested a sidebar, at which he explained that he objected because the State's comments referred to facts not in evidence and improperly appealed to the sympathy of the jury. The trial court sustained the objection and defense counsel responded by moving for a mistrial, which was denied by the trial court. Although defense counsel requested a curative instruction, apparently because he believed it was necessary to preserve the error for appellate review, he agreed with the trial court that one should not be given because it would only serve to highlight the erroneous comment.[9] Because the trial court recognized the error and sustained the objection, I agree that the standard of review is whether the trial court abused its discretion in denying the mistrial. As the Court stated in Goodwin v. State, 751 So.2d 537, 547 (Fla.1999), if "the trial court recognize[s] the error, sustain[s] the objection and [gives] a curative instruction ..., the correct appellate standard is whether the trial court abused its discretion in its denial of a mistrial."[10]
On the other hand, I take issue with Justice Bell's criticism of Parker v. State, 873 So.2d 270, 284 (Fla.2004) (finding that the trial court properly denied a motion for a mistrial where an improper comment, which was objected to by counsel and the judge neither sustained the objection nor issued a curative instruction, was harmless beyond a reasonable doubt). As previously noted, when an improper comment is made, objected to by counsel, and either sustained by the trial court or corrected by the issuance of a curative instruction, this Court has consistently held that the proper standard of review governing the denial of a motion for a mistrial based on improper comments is for an abuse of discretion. Chamberlain v. State, 881 So.2d 1087, 1098 (Fla.2004); Rivera v. State, 859 So.2d 495, 511-12 (Fla.2003); Anderson v. State, 841 So.2d 390, 403 (Fla.2003); Doorbal v. State, 837 So.2d 940, 956-57 (Fla.2003); Smithers v. State, 826 So.2d 916, 930 (Fla. 2002); Card v. State, 803 So.2d 613, 621-22 (Fla.2001); Gore v. State, 784 So.2d 418, 427-28 (Fla.2001); Rodriguez v. State, 753 So.2d 29, 39 (Fla.2000); Goodwin, 751 So.2d at 547.
However, depending on the disposition of the objection by the trial judge, this Court may apply a two-step inquiryfirst examining the improper comment under the harmless error standard and then reviewing the denial of the motion for mistrial under an abuse of discretion standard. For instance, where the trial court overrules an objection and denies the motion for a mistrial, this Court has stated that the improper comments "would have been reviewed under the harmless error standard, and the motion for a mistrial based *382 upon these comments would have been reviewed for an abuse of discretion." Belcher v. State, 961 So.2d 239, 255 (Fla.2007). This is because it is entirely appropriate to apply a harmless error analysis where the trial court fails to recognize that an improper comment has been made and overrules the objection. See Dessaure v. State, 891 So.2d 455, 464-66 & n. 5 (Fla.2004) (stating that the denial of a mistrial is subject to an abuse of discretion, but where the trial court overruled the objection, "the proper standard of review ... is a harmless error standard"); see also Snelgrove v. State, 921 So.2d 560, 568 (Fla. 2005) (stating that overruled objections are governed by a harmless error analysis); Doorbal, 837 So.2d at 956-57 (same); Rodriguez, 753 So.2d at 39 (same). Thus, when a lawyer simultaneously objects to an improper comment and moves for a mistrial, this Court will apply two different standards to the introduction of improper comments depending on whether the trial court properly recognized the error and sustained the objection or gave a curative instruction (abuse of discretion) or whether the trial court failed to recognize the error and improperly overruled the objection (harmless error to the comments, abuse of discretion to the denial of the mistrial). See, e.g., Belcher, 961 So.2d at 255.
This is the reason I continue to agree with the Court's decision to apply harmless error in Parker, which involved another distinct set of circumstances. In Parker, the lawyer simultaneously objected to an improper comment and moved for a mistrial, but the trial court denied the motion for a mistrial without explicitly ruling on the objection. 873 So.2d at 284 & n. 10. In that case, the Court unanimously agreed that the proper standard of review that should be applied to the improper comments, where the judge neither sustained the objection in front of the jury nor gave a curative instruction, was that of harmless error. Id.[11] Nevertheless, several months later, a majority of the Court in Dessaure reached a contrary conclusion in an identical situation. In that case, the lawyer simultaneously objected to an improper comment during opening statements and moved for a mistrial, but the trial court denied the motion for a mistrial without ruling on the objection. 891 So.2d at 465 n. 5. Rather than apply a harmless error analysis to the improper comment, consistent with the unanimous decision in Parker, the majority concluded that the failure to rule on the objection should not be treated as an "overrule" and the proper standard was to simply review the motion for a mistrial for an abuse of discretion. Id. Along with Justice Anstead, I concurred in result only in Dessaure because of the apparent conflict with Parker and because I believed that the trial court's denial effectively overruled the objection, even though the judge failed to use that specific term. Id. at 473-74 (Pariente, J., concurring in result only). Although I recognize that the Court reached a contrary conclusion in Dessaure, I continue to believe that where the trial court fails to rule on the objection and the context of the court's denial of the mistrial indicates that *383 it has effectively "overruled" the objection, the Court should follow Parker in that specific scenario and first apply a harmless error analysis to the improper comment.
More importantly, when a trial judge considers objections at a sidebar, the trial judge's rulingespecially where the objection has been sustainedshould be communicated to the jury. To avoid an inadvertent trap, the best way to handle this issue is for the trial lawyer to first specifically object and request a ruling on the objection. If the objection is overruled, no further action is needed in order to preserve the issue for appellate review, and the harmless error analysis from State v. DiGuilio, 491 So.2d 1129 (Fla.1986), will apply on appeal. If the objection is sustained, the next consideration is whether the error can be addressed through a curative instruction, which could be as simple as advising the jury to disregard the last statement because it was improper. If the nature of the statement is such that a curative instruction will not unring the bell or will highlight the error even further, the next step is to move for mistrial. In that scenario, where the objection has been sustained by the trial court, then the trial court should only grant the mistrial if "it is necessary to ensure that the defendant receives a fair trial." Goodwin, 751 So.2d at 546-47 (quoting Cole v. State, 701 So.2d 845, 853 (Fla.1997)); see also Terry v. State, 668 So.2d 954, 962 (Fla.1996). Although I agree that the standard of review we would apply in that circumstance is abuse of discretion, we must be mindful that our primary concern in all criminal trials, especially in death cases, is to ensure a fair trial. See, e.g., Gore v. State, 719 So.2d 1197, 1202 (Fla.1998).
Finally, I take this opportunity to once again caution, as the Court has done in the past, that prosecutors should avoid making impermissible comments in closing argument. See id. Although prosecutors have an awesome responsibility and the facts of the crime often inspire righteous indignation, they are also officers of the court who have duties to both "refrain from improper methods calculated to produce a wrongful conviction" and "to use every legitimate means to bring about a just one." Id. at 1202 (quoting Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In fact, prosecutorial misconduct "is especially egregious in ... a death case, where both the prosecutors and courts are charged with an extra obligation to ensure that the trial is fundamentally fair in all respects," and the effects of the impropriety extend well beyond the trial itself, threatening a guilty verdict and risking the delay inherent in a reversal and retrial. Id.
ANSTEAD, J., concurs.
BELL, J., specially concurring.
I fully concur in the majority opinion. I write separately to address a concern I have about confusion our recent case law may have created regarding the standard of review of a trial court's ruling on a motion for mistrial based on improper prosecutorial comments. As explained below, the standard should be abuse of discretion, regardless of whether or not the objection to the improper comments is sustained in front of the jury or a curative instruction is given.
We have held that a trial court's ruling on a motion for mistrial based on improper prosecutorial comments is subject to an abuse of discretion standard of review. See Perez v. State, 919 So.2d 347, 363 (Fla.2005); Ford v. State, 802 So.2d 1121, 1129 (Fla.2001). Abuse of discretion occurs where the comments were so prejudicial as to deny the defendant a fair trial. Cole v. State, 701 So.2d 845, 853 (Fla.1997). By contrast, the harmless error standard *384 is far less deferential. Under the harmless error standard, "the question is whether there is a reasonable possibility that the error affected the verdict." State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986). "If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful." Id.
The confusion as to which standard applies stems from this Court's decision in Parker v. State, 873 So.2d 270, 284 n. 10 (Fla.2004). In Parker, the trial court denied the defendant's motion for a mistrial based on the prosecutor's promise to correct his misstatement in the closing argument. Id. at 283. On appeal, Parker asserted that the trial court erred in not granting his motion for a mistrial. This Court disagreed. However, instead of applying an abuse of discretion standard, the Court applied a harmless error standard. In a footnote, the Court explained its choice of standard:
In Goodwin v. State, 751 So.2d 537 (Fla.1999), we held that "use of a harmless error analysis under [State v.] DiGuilio, [491 So.2d 1129 (Fla.1986),] is not necessary where ... the trial court recognized the error, sustained the objection and gave a curative instruction." 751 So.2d at 547. Because the trial court in this case neither sustained Parker's objection in front of the jury nor gave a curative instruction, we conclude that a harmless error analysis is appropriate in this case.
Id. at 284 n. 10.
The logic of Parker is unfortunate and, respectfully, flawed. A trial court's ruling on a motion for a mistrial should not be subject to a more scrutinizing standard of review merely because the judge opted not to sustain the objection in front of the jury or to give a curative instruction. The abuse of discretion standard should still apply.
Trial courts routinely instruct counsel not to make "speaking objections" in front of the jury. Counsel is directed to simply say, "Objection, your honor" and request to approach the bench so that the substance of the objection can be heard at a sidebar conference. The purpose of this procedure is to assure that the objection is argued outside the jury's hearing. Moreover, depending on the circumstances, it is not unusual for trial courts to remove the jury from the courtroom so that this sidebar conversation can occur completely free of any concern that the jury might hear the discussion. When a jury is removed, it takes several minutes, at a minimum, to return them.
In such circumstances, given that there is no more than a simple "objection" before the jury prior to sidebar and the resolution of the objection has occurred completely outside the jury's hearing, it is not necessarily improper for a trial court to then decide not to highlight the objectionable comment by sustaining the objection in front of the jury post-sidebar or, even more problematic, to give a curative instruction. Depending on the circumstances of each case, doing so may simply exacerbate the harm by unduly highlighting the erroneous comment. In this light, the decision whether or not to sustain the objection before the jury post-sidebar or to give a curative instruction is a decision best left to a trial court's discretion. See Israel v. State, 837 So.2d 381, 389 (Fla. 2002) (holding that the trial court, which refused to admonish the jury so that no further attention would be drawn to the error "was well within its discretion to determine that the statement did not prevent Israel from receiving a fair trial"); see also Dessaure v. State, 891 So.2d 455, *385 464-65 (Fla.2004) (applying the abuse of discretion standard where the trial court denied the motion for mistrial without formally ruling on the defendant's objection).
Accordingly, the standard of review of a trial court's ruling on a motion for mistrial based on improper prosecutorial comments should be abuse of discretion regardless of whether or not the objection is sustained in front of the jury or a curative instruction is given.
WELLS and CANTERO, JJ., concur.
NOTES
[1] Julius Hatcher, Fred Cummings, and Ronze Cummings are cousins. Hatcher was close with Fred. But at the time of the crimes, Hatcher and Ronze had not seen each other since early childhood and did not recognize each other.
[2] At the time of the shooting, the couple's six-year-old son was in the orange grove with some of the workers.
[3] The trial court found and weighed the following aggravators: (1) Salazar had a prior violent felony conviction, the contemporaneous attempted first-degree murder of Ronze Cummings, assigned some weight; (2) Salazar committed the murder while engaged in the commission of a burglary, assigned some weight; (3) the murder was committed in an especially heinous, atrocious, or cruel (HAC) manner, assigned great weight; and (4) the murder was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification, assigned great weight.
[4] The trial court found and weighed the following nonstatutory mitigators: (1) Salazar was not the actual shooter, assigned little to some weight; (2) Salazar comes from a broken home and was devastated by his parents' divorce, assigned little weight; (3) Salazar was raised in an impoverished environment in a third world country, assigned minimal weight; (4) Salazar is capable of and has a good relationship with his family members, assigned minimal weight; (5) Salazar was a good student, attended school regularly, and obtained a vocational degree in woodworking, assigned little weight; and (6) Salazar was well behaved during the court proceedings, assigned minimal weight.
[5] Salazar also claims that the error was compounded when Brock held up the book of evidence he collected in the case. This issue is procedurally barred because the defense did not object to Brock holding up the book at trial.
[6] Salazar also claims (1) that the trial court erred in giving the standard jury instruction on the CCP aggravator; and (2) that the State made improper statements regarding CCP during closing arguments. Salazar's claim regarding the standard jury instruction is meritless. See Donaldson v. State, 722 So.2d 177, 187 n. 12 (Fla.1998) (noting that this Court specifically approved the standard jury instruction on the CCP aggravator). Further, Salazar's claim regarding the State's comments is not preserved for appeal because he failed to interpose a contemporaneous objection.
[7] Salazar also asserts that Florida's sentencing structure unconstitutionally fails to narrow the category of death-eligible persons as mandated by the United States Supreme Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). This Court has rejected similar challenges as meritless. See Williams v. State, 967 So.2d 735, 767 (Fla.2007); Miller v. State, 926 So.2d 1243, 1260 (Fla.2006).

Also, Salazar challenges the standard jury instruction asking jurors to consider mitigation after being "reasonably convinced of its existence." We recently upheld the instruction against a similar challenge. See Johnson v. State, 969 So.2d 938, 961-62 (Fla.2007).
[8] Indeed, Justice Bell in his specially concurring opinion observes that "trial courts routinely instruct counsel not to make `speaking objections' in front of the jury." Although I understand the reasons for this practice, it has the potential to disadvantage the party making the objection because it not only interrupts the closing argument but, when the discussion is made at sidebar, there is a risk that the trial court's ruling will not be communicated to the jury. If the objection is sustained, as it was here, the jury should know the argument was improper by at least being informed that the objection was sustained.
[9] Although counsel believed that requesting a curative instruction was required to preserve the error for review, "a defendant need not request a curative instruction in order to preserve an improper comment issue for appeal. The issue is preserved if the defendant makes a timely specific objection and moves for a mistrial." James v. State, 695 So.2d 1229, 1234 (Fla. 1997) (quoting Spencer v. State, 645 So.2d 377, 383 (Fla.1994)); accord Kearse v. State, 770 So.2d 1119, 1129 (Fla.2000); Walker v. State, 707 So.2d 300, 314 n. 8 (Fla. 1997).
[10] Although it would have been better practice for the trial court to have sustained the objection in front of the jury, that step was not necessary to preserve the denial of the motion for a mistrial for appellate review.
[11] Justice Bell asserts that the reasoning of Parker is flawed because a "ruling on a motion for a mistrial should not be subject to a more scrutinizing standard of review merely because the judge opted not to sustain the objection in front of the jury or to give a curative instruction." Specially concurring op. at 384. Although this Court noted that harmless error applied because the trial court failed to sustain the objection "in front of the jury," I believe Parker stands for the proposition that harmless error applies where the trial court simply fails to sustain an objection, regardless of whether that ruling is in the presence of the jury.